BARHAM,' Justice.
Plaintiff, Norman Nelson, brought this suit seeking remuneration allegedly due under a provision of a contract entered into between himself and the defendants, Control Systems International, Inc., C. B. Herod, and T. L. Parker. The trial court awarded judgment in favor of plaintiff, which the court of appeal reversed. 299 So.2d 570 (La.App. 4th Cir. 1974). Upon plaintiff’s application, this Court granted certiorari. 302 So.2d 305 (La.1974). We reverse the decision of the court of appeal and reinstate the judgment of the trial court in favor of plaintiff.
The circumstances leading to the agreement between the parties are as follows:
In 1970, defendants C. B. Herod and Tom Parker formed Control Systems International, Inc., for the purpose of designing and installing safety valve systems and controls for offshore oil wells. Herod and Parker were possessed of certain skills and expertise, and they believed this service to *334 be marketable. However, neither had the necessary capital and they were seeking financial aid in order to begin operation of their business as soon as possible. After several unsuccessful attempts to secure financing, they approached plaintiff Nelson, who, at the time operated a repair shop for valves used in the offshore oil industry. Nelson had shop and office facilities, insurance coverage, and the necessary capital needed by Control Systems to begin operation immediately.
Following several weekends of negotiations, the three men drafted and signed an agreement, which is the subject of this litigation.[1] Generally, the agreement provides that Nelson loan Control Systems a maximum of $15,000.00 at seven per cent interest as needed, to be repaid within three years, and purchase one-third of the corporate stock for $333.34. To secure the loan, Herod and Parker, each owning one-third of the stock, pledged their stock to Nelson until repayment of the loan. Nelson also agreed to provide, at a reasonable cost, shop facilities, liability insurance coverage, and workmen’s compensation. Additionally, remuneration for Nelson was provided for in Article V of the agreement, which is the Article at issue, as follows :
“The salaries of stockholder employees of CSI will be no greater than $1,000 per month, plus reasonable expenses, until the loan made by NELSON is paid in full. NELSON shall receive remuneration of not less than 50% of the combined salary and expenses of the highest paid CSI employee regardless of whether NELSON is a full-time employee or not.”
Subsequent to the signing of the agreement, Nelson provided Control Systems with the money it needed to begin operations. Due to developments in the offshore oil industry, the corporation prospered beyond its incorporators’ expectations. The loan from Nelson was repaid within five months from the date of the contract. At that time, Herod and Parker removed Nelson from the Board of Directors. They also informed him that he was no longer entitled to the remuneration stipulated in Article V, since it was their opinion that the payments were to continue only as long as the loan was outstanding.
During the five months prior to repayment of the loan, Nelson received remuneration equal to one-half of Herod’s salary. The profits of the corporation were paid out in the form of salaries only, and no dividends were ever declared. Subsequent to the repayment of the loan, the salaries of Herod and Parker have been periodically raised, reaching the level of $2,000.00 per month each at the time of the trial, plus expenses and other benefits.
Thus, the sole issue is the interpretation of Article V of the contract within the context of the entire agreement. Plaintiff contends that the remuneration stipulated in Article V is to continue indefinitely, whereas defendants contend that remuneration of plaintiff was to continue only as long as the loan was outstanding. We hold that the plaintiff’s interpretation of the contract is the correct one.
Control Systems was envisioned from its beginning as a private closed corporation. There were only three shareholders, Parker and Herod, and the plaintiff, Nelson. Nelson, owning only one-third of the stock, was a minority shareholder. The record shows that Parker and Herod had approached other potential supporters with their plans, and had been rejected precisely because none of the other potential supporters were willing to accept less than a controlling share of the stock. It is clear that one of the reasons why Nelson was willing to become a minority shareholder in spite of the capital he invested in the corporation was the assurance that he would be entitled to participate in profits as stipulated in Article V. Since no dividends were contemplated at the time of the *335 agreement, and none were ever in fact paid, the only method whereby one could participate in the profits of the corporation was by means of salary remuneration.
The entire agreement, read as a whole, discloses the intent of the parties relative to two obligations owed by Herod and Parker to Nelson. The first was the obligation owed by debtors to a creditor, which was secured by the pledge of their stock to Nelson, and by the salary limitation found in the first sentence of Article V. The second obligation was that agreed by majority shareholders to be owed to a minority shareholder, protecting the latter’s right to participation in profits in his status as shareholder. The first obligation ceased to exist when the loan was repaid in full. However, the repayment of the loan should have had no effect on the second obligation, except insofar as the remuneration could be increased with the removal of salary restrictions on the other shareholder employees since Nelson’s remuneration was to remain at all times one-half of the highest salary paid to a Control Systems employee. Absent the remuneration provision in Article V, and in view of the lack of dividends, Nelson’s one-third interest in the corporation could have been rendered meaningless, and reduced to a one-third share of accounts receivable only, by the majority shareholders.
We hold that the contract is not ambiguous, and that our construction of it merely enforces it as written. It was the contention of the defendants and the reasoning of the court of appeal that the first sentence in Article V rendered the second ambiguous. However, we reject that' interpretation because it is our opinion that the first sentence was inserted relative to the goal of repayment of the loan, whereas the second sentence was inserted to assure continuing participation in profits by a minority shareholder regardless of when the loan was repaid. We are merely enforcing what we consider to be the clear meaning of the contract, even though it was worded somewhat inarticulately since it was drafted by three laymen without legal counsel. The entire contract read as a whole, evidences two intentions of the parties, and our construction is the only one which gives effect to both of these intentions, i. e., repayment of Nelson’s loan, and a continuing one-third interest in Control Systems which is not capable of being rendered valueless by the majority shareholders.[2]
For the reasons assigned, the decision of the court of appeal is reversed and the judgment and award of the trial court are ordered reinstated. Costs are cast against the defendants.
SUMMERS, J., dissents for the reasons assigned by the Court of Appeal, see La. App., 299 So.2d 570.
MARCUS, J., dissents and assigns reasons.
APPENDIX
AGREEMENT
THIS AGREEMENT made and entered into this 19 day of January, 1971 by and between Control Systems International, Inc., a corporation organized under the laws of the State of Louisiana and hav *336 ing its principal place of business in New Orleans, Orleans Parish, Louisiana hereinafter referred to as CSI and Norman A. Nelson, a resident of Houston, Harris County, Texas hereinafter referred to as NELSON,
WITNESSETH
WHEREAS CSI, which was formed by C. B. Herod and T. L. Parker for the purpose of manufacturing and selling control systems and components, is in need of financial aid to permit operation of the company for its intended purposes; and
WHEREAS, NELSON is willing to provide financial aid to CSI up to an amount of $15,000;
NOW THEREFORE, for and in consideration of the sum of $333.34 paid by NELSON to CSI, the receipt of which is hereby acknowledged and by the mutual covenants and agreements hereinafter set forth, the parties hereto have agreed as follows:
I.
CSI agrees to give NELSON one-third of the stock of CSI which shall represent a one-third interest in CSI including a one-third interest in all accounts receivable.
II.
NELSON agrees to loan CSI monies with a total outlay of $15,000, payable with $5,000 down and the remainder in $2,500 amounts, as needed, until a total of $15,-000 has been provided. It is understood however that in the event the total amount is not needed, it will not be necessary to provide additional funds at a later date.
III.
To secure the loan made by NELSON to CSI, the stockholders of CSI agree to assign their CSI stock to NELSON as collateral.
IV.
All profit generated by CSI will be applied to retire the secured loan made by NELSON to CSI. When the said loan has been paid off, the stock assigned to NELSON as collateral by the stockholders of CSI shall be returned to these owners. After the stock has been returned to the original owners NELSON shall still retain one-third of the stock and interest in CSI and the other stockholders shall retain the remaining two-thirds.
V.
The salaries of stockholder employees of CSI will be no greater than $1,000 per month, plus reasonable expenses, until the loan made by NELSON is paid in full. NELSON shall receive remuneration of not less than 50% of the combined salary and expenses of the highest paid CSI employee regardless of whether NELSON is a full-time employee or not.
VI.
NELSON agrees to provide CSI, at a reasonable cost to CSI, shop and office facilities and workman’s compensation and liability insurance coverage.
VII.
In the event any of the parties hereto decide to sell any of his stock in CSI the remaining stockholders, individually, or through CSI, shall have the right to purchase said stock at a price not to exceed 10% above book value or ten times CSI’s net earnings for the past 12 months, whichever is greater. It is also agreed that payment for said stock can be made with one-third down, one-third after one year, and the remaining one-third after the second year. The interest charge on the unpaid portion shall be 7% per annum.
*337 VIII.
The parties hereto agree not to participate in any activity contrary to CSI’s interest both while as a stockholder and for one year after terminating association with CSI provided termination is voluntary.
IX.
CSI shall have three years to retire the debt incurred with NELSON beginning the date of his agreement and will pay an interest charge of 7% per annum on all amounts due.
X.
This agreement shall inure to the benefit of and he binding upon the parties hereto, the heirs, personnel representatives and assigns of NELSON, T. L. Parker and C. B. Herod, and the successors and assigns of CSI and its stockholders.
Executed in quadruplicate copies, each of which shall be an original copy, on the day and year first above written to evidence which witness our hands and the seal of said corporation.
Tom Parker_ T. L. Parker, Individually
C. B. Herod_ C. B. Herod, Individually
Control Systems International, Inc.
By Tom Parker_ President
Norman A. Nelson_ Norman A. Nelson

. See Appendix for the full text of the agreement.

. Although we reject the need for parol evidence, we note from the testimony that all three parties originally contemplated that Nelson’s actual participation in the corporation other than merely sharing profits would continue after the repayment of the loan. Both Parker and Herod testified that they considered Nelson a “partner” in the corporation. At the time of the agreement, Nelson operated a valve repair shop for W.K.M., a producer of valves used in the oil industry operations. He had experience as an engineer that neither Parker or Herod had, as well as numerous business contacts and experience in the offshore oil industry which Control Systems intended to utilize. These extrinsic factors merely underscore our decision that the only possible construction of the contract is the one which we have adopted.